STATE OF NORTH CAROLINA v. ANTONIO DONNELL NEAL, Defendant

No. COA10-210

(Filed 5 April 2011)

**Search and Seizure— consent—material conflict in evidence— written findings required**

A conviction on cocaine charges was remanded where the trial court did not make written findings about whether a promise was made to defendant to obtain his consent for a search of his apartment.

Appeal by defendant from judgment entered 16 September 2009 by Judge Calvin E. Murphy in Mecklenburg County Superior Court. Heard in the Court of Appeals 15 September 2010.

*Attorney General Roy Cooper, by Special Deputy Attorney General Lars F. Nance, for the State.*

*Guy J. Loranger for defendant-appellant.*

GEER, Judge.

Defendant Antonio Donnell Neal appeals from his conviction of (1) felony trafficking in more than 28 grams but less than 200 grams of cocaine by possession and (2) misdemeanor possession of drug paraphernalia. The trial court orally denied defendant's motion to suppress evidence seized from his apartment. In doing so, the trial court failed to comply with N.C. Gen. Stat. § 15A-977(f) (2009) and its requirement that a trial court enter a written order with findings of fact resolving a material conflict in the evidence as to whether any promise was made to induce defendant's consent to the search. We, therefore, remand to the trial court for the limited purpose of making the necessary findings of fact and reconsidering its conclusions of law in light of those findings.

Facts

On 27 March 2006, defendant was indicted for (1) trafficking in more than 28 grams but less than 200 grams of cocaine by possession and (2) possession of drug paraphernalia. Prior to trial, defendant filed a motion to suppress any evidence seized by law enforcement officials after a search of his apartment on 17 March 2006 on the

grounds that the search violated the Fourth and Fourteenth Amendments to the United States Constitution.

During the course of the hearing before the trial court on the motion to suppress, the State presented the testimony of Officers Brian Scharf and James Gilliland of the Charlotte-Mecklenburg Police Department. According to the officers, on 16 March 2006, they began surveillance of a unit in the Beacon Ridge apartment complex. They were looking for Antonio Boone who had an outstanding arrest warrant for assault with a deadly weapon. Officer Scharf, the lead investigator in Mr. Boone's case, had received a Crimestoppers tip that Mr. Boone was staying at the apartment, which was defendant's residence. At the time, the officers were not looking for defendant for any reason other than to locate Mr. Boone.

During the surveillance, defendant left his apartment and drove to a Charlotte Housing Authority ("CHA") property. The officers followed defendant and saw him enter a CHA apartment and leave after 10 to 15 minutes. The officers then checked a CHA ban list and learned that defendant had been banned from CHA property. Based on this information, the officers obtained a warrant for defendant's arrest for second degree trespassing.

Officers Scharf and Gilliland returned to Beacon Ridge with the warrant on 17 March 2006 and resumed their surveillance of defendant's apartment. After arriving, they saw defendant leave the apartment and start to drive away in his vehicle. The officers stopped the vehicle in the parking lot around the corner of the apartment building.

Upon making the stop, the officers directed defendant to get out of his car, placed him in handcuffs, and informed him that there was a warrant for his arrest. Officer Scharf told defendant that they were looking for Mr. Boone and asked whether Mr. Boone was inside the apartment. Defendant nodded his head "yes." The officer also asked if there were any weapons in the apartment, and defendant said there might be a gun. At that point, Officer Scharf asked defendant for consent to search the apartment for Mr. Boone and any weapons that might be inside, and defendant orally gave consent. Both officers testified that they did not draw a firearm or make any threats or promises to gain defendant's consent to the search of his apartment.

The officers called for backup, including a SWAT team. While they waited for backup to arrive, Officer Gilliland watched the front of the apartment, and Officer Scharf waited with defendant. After

backup arrived, the officers put defendant in another officer's patrol car. Officer Scharf then took a position at the front of the apartment, and Officer Gilliland took a position at the back. After a few minutes, and before the SWAT team arrived, Mr. Boone exited the front door of the apartment. Officer Scarf placed Mr. Boone under arrest and canceled the SWAT team call. Afterwards, Officer Scarf again asked defendant if he could search his apartment for weapons, and defendant again gave oral consent for the search.

Once the officers entered the apartment, Officer Gilliland discovered, in the bedroom, a plastic molding gun box, marijuana, and a marijuana bong. In the bedroom closet, he also found a locked safe that was big enough to hold a gun. The officers opened the safe using the safe key on defendant's key chain. The safe contained $1,080.00 in cash, digital scales, and a purple Crown Royal bag that contained a "large quantity" of what the officers believed to be crack cocaine. The officers then arrested defendant based on what they had found in the safe.

The officers subsequently transported defendant to the Law Enforcement Center. Officer Scarf read defendant his *Miranda* rights, and defendant signed a written waiver of those rights. Officer Scarf then interviewed defendant, and, at the close of the interview, defendant signed a written statement that Officer Scarf had prepared. The statement indicated that defendant had given Officer Scarf consent to search his apartment.

Defendant's testimony at the hearing on the motion to suppress conflicted with that of the officers, particularly concerning whether the officers made any promises to him. He testified that after he was stopped, Officer Scharf "said if I just, you know, let him know where Antonio Boone was, that he'd strike the trespass warrant he had for me." According to defendant, after Mr. Boone was arrested, Officer Scharf "again . . . said if I let them search the house he'd strike the trespass warrants on me. So I let him search the house at that point." Defendant emphasized that his consent "was based on" Officer Scharf's representation that he would strike the trespass warrant.

At the close of the evidence, the trial court denied defendant's motion to suppress. The court did not enter a written order, but orally made the following findings of fact from the bench:

That on or about March 16th, 2006, Officer Brian Scharf and James Gilliland conducted a surveillance of 1524 Beacon Ridge Road because they had previously received a report through

Crimestoppers that Mr. Boone, Antonio Boone, was living in that apartment complex. They were searching for Mr. Boone because there was an outstanding warrant for his arrest for a serious assault charge.

At that time the officers had no information about the defendant, Antonio Neal, or were they searching for him, and did not have any outstanding warrant for his arrest.

Part of the tip received through Crimestoppers was that Antonio Boone had a friend by the name of Antonio Neal, where he, Mr. Boone, might be staying.

To investigate the matter Officers Scharf and Gilliland set up surveillance at 1524 Apartment 810 Beacon Ridge Road to investigate the validity of the information that they had received through Crimestoppers.

That through investigation Officer Scharf determined that Antonio Neal lived at 810, in Apartment 810 of the Beacon Ridge Road Apartments. That the officers were not looking for Mr. Neal for any reason other than to locate Antonio Boone.

That on or about the 16th day of March 2006, while conducting surveillance at the apartment complex, Officer Scharf observed Mr. Neal leave his apartment and enter a vehicle, and followed him to Boulevard Homes, known to the officers to be a Charlotte Housing Authority property.

That thereafter Sergeant Scharf then checked the ban list for Charlotte Housing Authority properties and found that an individual bearing the name of Antonio Donnell Neal, black male, date of birth October 19, 1978, had been banned from Charlotte Housing Authority property.

Having observed Mr. Neal on what the officers believed to be Charlotte Housing Authority property, they obtained a warrant for his arrest. On the following day, on the 17th of March 2006, went [sic] back to Mr. Neal's address, arrested him for trespass and asked him about Mr. Boone.

Officer Scharf also wanted to search the residence for Mr. Boone. He conceded he was not sure that Mr. Boone was indeed in the residence.

On that date, March 17th, Officer Scharf, accompanied by Officer Gilliland, observed the defendant exit his apartment and enter a vehicle parked nearby.

When the defendant pulled around the corner of the building, Officer Scharf and Officer Gilliland stopped the vehicle and arrested the defendant on the outstanding trespassing warrant.

Officer Scharf spoke with the defendant about Antonio Boone, and asked if there was anyone else in the apartment; that Antonio Boone was wanted. The officers did not explain what the charge was, and asked Mr. Neal, the defendant, if Antonio Boone was inside the apartment.

The defendant did not respond audibly, but shook his head, quote yes, closed quote. Officer Scharf asked the defendant if he could search the apartment for Antonio Boone and for a weapon.

Officer Scharf did not question the defendant about drugs at that point because he was specifically looking for firearms due to the nature of the charge against Mr. Boone.

After the defendant was placed under arrest for the trespassing warrants, the officers sought to call backup, including the SWAT team. And before the SWAT team arrived, another officer, uniformed officer arrived and took custody of the defendant.

Then Officer Scharf and Officer Gilliland then set up surveillance on the apartment. Before the SWAT team could arrive, Officer Scharf observed Mr. Boone coming out of the apartment and immediately arrested him.

That thereafter they obtained the defendant's consent to search the apartment for guns, Officer Scharf and Officer— correction. Having obtained the defendant's consent to search the apartment for guns, Officer Gilliland conducted a search of the interior of the one bedroom apartment.

During the search Officer Gilliland noticed a plastic molded gun box in the bedroom, but the gun was not inside. Upon further search of the closet area, Officer Gilliland located a safe approximately two feet by two feet in dimension. He continued his search, but did not find anything else of interest.

Officer Gilliland advised Officer Scharf that there was a locked safe in the bedroom. Officer Scharf had possession of the defendant's keys, and noticed that there was a safe key on the chain.

STATE v. NEAL

[210 N.C. App. 645 (2011)]

Officer Scharf then used the key to open the safe, and discovered inside a purple Crown Royal — inside a purple Crown Royal bag, a quantity of what he believed to be cocaine, and cash and scales.

Thereafter the defendant was transported to the Law Enforcement Center where he was taken to an interview room approximately six feet by six feet in dimension. The room was equipped with shackles.

The officers had weapons, but did not draw them. They did not threaten the defendant, nor make any promises to him to get him to waive his Miranda rights. The defendant was advised of his rights and waived them in writing.

After obtaining a waiver — strike that. While in the interview room the defendant was not promised anything to induce him to make a statement. He was not threatened in any way, nor was any evidence of either intimidation directed toward him either to obtain the waiver of his Miranda rights or to make his written statement.

During the course of the interview the defendant signed a written statement that was prepared for him by Officer Scharf. That statement was signed by the defendant on March 17th, 2006.

In his statement, which has been marked as State's Exhibit Number 2, the defendant adopts what has been written by Officer Scharf indicating that he gave Officer Scharf permission to search his residence located at 1524, number 810, Beacon Ridge Road, and that he gave Officer Scharf permission to write the statement for him.

During the course of the interview at the Law Enforcement Center, the defendant and Officer Scharf and Officer Gilliland, who had heard only a portion of the interview or was actually present in the interview room, [sic] that the search that was conducted of the defendant's apartment was confined to where a weapon reasonably might be kept.

That the officer testified, and the officer agrees and the defendant agrees, that the defendant was cooperative at all times during the defendant's interaction with the officers.

The Court further finds that the defendant was not the objective of the original investigation. That investigation having been focused on Antonio Boone.

During his direct testimony, the defendant acknowledges that he gave the officer consent to search his apartment, but did so because he was under arrest at the time and Officer Scharf indicated he would strike the trespassing warrant if he gave such consent to search.

Based upon the foregoing findings of fact the Court concludes that in the totality of the circumstances the consent to search the defendant's apartment was knowingly, voluntarily and freely given.

And that the statement that the defendant subsequently gave to the officers was given freely, voluntarily and understandingly, without coercion or promise of award or under any duress.

The court then stated: "Based upon those findings and conclusions the Court denies the defendant's motion to suppress the evidence and the statement given in the case." After making its ruling, the court then noted some concerns it had, including concern about the CHA ban list, a concern that the court said had "been satisfied." The trial court, however, further noted that it "was also concerned about the dismissal of the underlying second degree trespass charge as the defendant testified the officers—or Officer Scharf promised him that that would be dismissed or it would otherwise be disposed of. But there is insufficient evidence provided to the Court to make an independent determination for the basis of the dismissal."

Defendant's case proceeded to trial. The State presented the testimony of Officers Scharf and Gilliland as part of its case in chief. The officers explained to the jury the circumstances leading to their search of defendant's apartment, which had yielded the digital scales and cocaine.

During Officer Scharf's testimony, the State admitted, over defendant's objection, a Charlotte-Mecklenburg Police Department property report listing some of the evidence seized from defendant's apartment, including the digital scales, the Crown Royal bag, the gun box, and the marijuana bong. The State also admitted, without objection from defendant, the items seized from defendant's apartment, including the scales and the cocaine. In addition, when Officer Scharf was discussing the property bag of evidence, a small packet of untested material, which the officer believed to be cocaine, was discovered in the bag. Through its questioning of the officer, the State suggested that the packet had been inside the marijuana bong, which had bro-

ken into pieces in the property bag. Defendant did not object to the testimony about this packet. In addition, forensic chemist Ann Charlesworth testified that the substance seized from defendant's apartment was 33.45 grams of cocaine.

Defendant offered no evidence on his own behalf, and the jury found defendant guilty of both (1) felony trafficking in more than 28 grams but less than 200 grams of cocaine by possession and (2) misdemeanor possession of drug paraphernalia. The trial court consolidated the convictions for sentencing and imposed a term of 35 to 42 months imprisonment and ordered defendant to pay a $50,000.00 fine. Defendant timely appealed to this Court.

Discussion

Defendant argues that the trial court erred in denying his motion to suppress the evidence of the scales and cocaine seized at his apartment, as well as in later admitting this evidence during trial. Because defendant did not object at trial to the admission of the evidence and testimony regarding the evidence, he failed to preserve this issue for appeal. *See State v. Golphin*, 352 N.C. 364, 405, 533 S.E.2d 168, 198 (2000) (holding pretrial motion to suppress is not sufficient to preserve for appeal question of admissibility of evidence where defendant does not also object at time evidence is offered at trial), *cert. denied*, 532 U.S. 931, 149 L. Ed. 2d 305, 121 S. Ct. 1379, 1380 (2001). Defendant, therefore, asks that this Court review the issue for plain error.

Defendant first contends that the trial court violated N.C. Gen. Stat. § 15A-977(f) by failing to enter a written order on the motion to suppress that included findings of fact resolving all material conflicts in the evidence. N.C. Gen. Stat. § 15A-977(f) provides that in ruling on a motion to suppress, "[t]he judge must set forth in the record his findings of facts and conclusions of law." "This statute has been interpreted as mandating a written order unless (1) the trial court provides its rationale from the bench, and (2) there are no material conflicts in the evidence at the suppression hearing." *State v. Williams*, 195 N.C. App. 554, 555, 673 S.E.2d 394, 395 (2009). If both of these criteria are met, the necessary findings of fact are implied from the denial of the motion to suppress. *Id.*

Here, the trial court announced its rationale for the denial of the motion to suppress from the bench. Defendant contends, however, that a written order was nonetheless required because there was a material conflict in the evidence regarding whether Officer Scharf promised

defendant that he would drop the trespass warrant in exchange for defendant's consent to the officers' searching his apartment.

Defendant, on the one hand, testified that Officer Scharf "said if [defendant] let them search the house he'd strike the trespass warrants . . . ." Officer Scharf, on the other hand, explicitly stated that at no time during his contact with defendant did he make any promises to him. The trial court recognized this conflict, but stated that it believed "there is insufficient evidence" for the court to resolve the conflict.

Defendant's testimony was, however, sufficient standing alone to require the trial court to resolve the conflict (assuming the conflict was material to the motion to suppress). *See State v. Biggs*, 289 N.C. 522, 531, 223 S.E.2d 371, 377 (1976) ("In the present case the police officers testified that defendant waived his right to presence of counsel. Defendant testified that he did not. Under these circumstances it was incumbent upon the judge to make an express finding in this regard, and his failure to do so rendered the admission of defendant's inculpatory statements to [the officers] erroneous."); *State v. Smith*, 135 N.C. App. 377, 380, 520 S.E.2d 310, 312 (1999) (holding evidence as to whether defendant consented to search was conflicting when two detectives testified that defendant consented to search of room, while defendant testified that detectives neither requested nor received his permission to search room). Defendant was not required to present any evidence apart from his own testimony. It was then up to the trial court to decide whom to believe: defendant or the officers.

The key question remains, however, whether this conflict was material. The Fourth Amendment prohibits unreasonable searches and seizures. In *State v. Smith*, 346 N.C. 794, 798, 488 S.E.2d 210, 213 (1997), the Supreme Court explained:

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 63 L. Ed. 2d 639, 651[, 100 S. Ct. 1371, 1380] (1980). Consent, however, has long been recognized as a special situation excepted from the warrant requirement, and a search is not unreasonable within the meaning of the Fourth Amendment when lawful consent to the search is given. . . . For the warrantless, consensual search to pass muster under the Fourth Amendment, consent must be given and the consent must be voluntary. . . . Whether the consent is voluntary is to be determined from the totality of the circumstances.

*See also* N.C. Gen. Stat. § 15A-221 (2009) (authorizing warrantless search where voluntary consent is given). The burden is upon the State to prove the validity of consent, "the presumption being against the waiver of fundamental constitutional rights." *State v. Vestal*, 278 N.C. 561, 579, 180 S.E.2d 755, 767 (1971).

Here, there is no dispute that defendant consented to the search. The issue is whether, considering the totality of the circumstances, that consent was voluntary. Our Supreme Court has expressly held that a trial court deciding the voluntariness of a defendant's consent must consider whether the defendant "was threatened or offered any promises or inducements in exchange for his consent to search." *State v. Austin*, 320 N.C. 276, 291, 357 S.E.2d 641, 650, *cert. denied*, 484 U.S. 916, 98 L. Ed. 2d 224, 108 S. Ct. 267 (1987). *See also State v. Weavil*, 59 N.C. App. 708, 711, 297 S.E.2d 772, 774 (1982) (holding motion to suppress properly denied when, *inter alia*, there was no evidence that defendant was "coerced by threats, promises or show of force").

In *State v. Fuqua*, 269 N.C. 223, 228, 152 S.E.2d 68, 72 (1967), the defendant was told by a police officer that the officer would testify as to the defendant's cooperation if the defendant would give a statement. The Supreme Court held that such a statement by a person in authority gave the defendant a clear hope for lighter punishment if he confessed, which rendered his confession involuntary and inadmissible. *Id.* In *State v. Williams*, 314 N.C. 337, 343, 333 S.E.2d 708, 713 (1985) (internal quotation marks omitted), this Court held that the principles set out in *Fuqua* were applicable in deciding whether a defendant's consent to a search of his automobile was "given freely, voluntarily, and understandingly" or whether it was "instead the product of promises and inducements of hope." Although the Court ultimately distinguished the facts in *Williams* from those in *Fuqua*, the Court's analysis and decision indicate that the issue whether there was a promise or inducement is material to whether a defendant's consent to a search was voluntary. *Id.* at 346-47, 333 S.E.2d at 715 (holding that once trial court resolved conflicts in voir dire testimony against defendant, its findings supported conclusion that officer did not make promise that was sufficient to render consent involuntary).

In light of these cases, we conclude that the conflict in the evidence as to whether the officers obtained defendant's consent by promising to drop the trespass charge was a material conflict. Consequently, the trial court violated N.C. Gen. Stat. § 15A-977(f) by

failing to enter a written order setting out findings of fact resolving the material conflict in the evidence. "For this reason, we cannot determine as a matter of law whether or not the evidence seized violated defendant's Fourth Amendment rights." *Smith*, 135 N.C. App. at 380, 520 S.E.2d at 312.

In *State v. Grogan*, 40 N.C. App. 371, 375-76, 253 S.E.2d 20, 23-24 (1979), when the trial court failed to make the necessary findings regarding the defendant's motion to suppress, and, on appeal, this Court was "unable to say that the introduction of the evidence sought to be suppressed . . . was harmless," the Court remanded for findings of fact. Here, the State would have had no evidence to support the charges in the absence of the evidence obtained in the search—specifically the cocaine and the scales. Since we cannot say that admission of the evidence in this case would not have had a probable effect on the verdict, we must, as in *Smith*, remand for the trial court to enter a written order with findings of fact and conclusions of law.

The State makes a curious argument that defendant waived any right to have written findings of fact. The State cites *Elliott v. Estate of Elliott*, 163 N.C. App. 577, 596 S.E.2d 819, *cert. denied*, 358 N.C. 731, 601 S.E.2d 530 (2004), and argues that "when a record does not reveal a request for the trial judge to make findings of fact and conclusion [sic] of law an assignment of error asserting that the trial court failed to make those findings and conclusions is properly overruled." As *Elliott* was applying Rule 52(a)(2) of the Rules of Civil Procedure, and this case is, of course, a criminal case, we fail to see how *Elliott* has any relevance. N.C. Gen. Stat. § 15A-977(f) and the precedent under that statute are controlling.

The State also relies upon *State v. Marsh*, 187 N.C. App. 235, 239, 652 S.E.2d 744, 746 (2007), *overruled in part on other grounds by State v. Tanner*, 364 N.C. 229, 695 S.E.2d 97 (2010), in which the defendant challenged the sufficiency of the trial court's findings of fact under N.C. Gen. Stat. § 15A-977(f). In *Marsh*, however, the Court was not addressing the complete absence of a written order, but rather was reviewing an order with "cursory" findings. This Court concluded that those findings were, "under the circumstances of [that] case, adequate" to support the trial court's order denying the defendant's motion to suppress. *Id.* Here, by contrast, "the circumstances" involved a material conflict in the evidence that, *Williams* holds, necessitated a written order with findings of fact resolving the conflict.

Although defendant claims that he is entitled to a new trial as a result of the trial court's omission, we disagree. Defendant relies on *Biggs*, 289 N.C. at 531, 223 S.E.2d at 377, in which the Supreme Court ordered a new trial after concluding that the trial court erred in admitting the defendant's statements to officers without first resolving a conflict in the evidence regarding whether the defendant had waived his right to counsel. Subsequent to *Biggs*, however, the Supreme Court held in *State v. Booker*, 306 N.C. 302, 312-13, 293 S.E.2d 78, 84 (1982), that a trial court's "failure to find facts resolving the conflicting voir dire testimony was prejudicial error requiring remand to the superior court for proper findings and a determination upon such findings of whether the inculpatory statement made to police officers by defendant during his custodial interrogation was voluntarily and understandingly made." In explaining its mandate, the Court observed: "Where there is prejudicial error in the trial court involving an issue or matter not fully determined by that court, the reviewing court may remand the cause to the trial court for appropriate proceedings to determine the issue or matter without ordering a new trial." *Id.* at 313, 293 S.E.2d at 84. Because, in *Booker*, the Court found no other prejudicial error apart from the inadequate findings as to voluntariness, the Court deemed it unnecessary to order a new trial. *Id.*

Based on *Booker*, we hold that the trial court's failure to make written findings does not require remand for a new trial, but remand for further findings of fact. *See also State v. Baker*, 208 N.C. App. 376, 387, 702 S.E.2d 825, 832-33 (2010) (remanding for findings where court failed to make findings resolving material conflict in evidence as to whether reasonable person in defendant's position would not have felt free to leave); *Smith*, 135 N.C. App. at 380, 520 S.E.2d at 312 (remanding for findings where court failed to make findings resolving material conflict in evidence as to whether defendant voluntarily consented to search of his room).

Accordingly, we remand for further findings of fact that resolve the material conflict in the evidence regarding whether a promise was made to defendant in order to obtain his consent to search his apartment. After the trial court makes the necessary findings, it must make appropriate conclusions of law based on those findings. If the trial court determines that the motion to suppress was properly denied, then defendant would not be entitled to a new trial because there would have been no error in the admission of the evidence, and his convictions would stand. If, however, the court determines that the

motion to suppress should have been granted, defendant would be entitled to a new trial.

Remanded.

Judges McGEE and CALABRIA concur.